CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

9/27/2022

LAURA A. AUSTIN, CLERK
BY:  s/ CARMEN AMOS
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | | |
|---|---|---|
| CODY MCCULLOCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:20-cv-00035 |
| | ) | |
| TAHSIN INDUSTRIAL CORP., USA, | ) | By:  Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

## MEMORANDUM OPINION

Cody McCulloch was installing a treestand used for hunting when the support cables failed

and he fell twenty feet to the ground, suffering serious and permanent injuries.   McCulloch is suing

the manufacturer of the treestand, Tahsin Industrial Corp., for breach of the implied warranty of

merchantability, arguing that the design was unreasonably dangerous and that the warnings were

inadequate.   Tahsin moves for summary judgment and to exclude plaintiff's expert witness,

Charles Powell.   (Dkt. Nos. 49, 50.)   McCulloch moves to exclude Tahsin's expert witnesses

George Saunders, Lorne Smith, and Kimberly Kushner.[1]   (Dkt. No. 54.)

For the reasons stated below, Tahsin's motion for summary judgment will be granted in part

and denied in part; Tahsin's motion to exclude Powell will be denied; and McCulloch's motion to

exclude expert testimony will be denied.

### I.   BACKGROUND

**A.   Treestand and Accident**

The subject treestand is an Ameristep Hang-On Treestand, model WMHO-201, that was

manufactured in 2013, seven years before the subject accident, with a rated weight capacity of 300

---

[1]   McCulloch also moved to exclude testimony from Barbara Byers (Dkt. No. 54), but in response, Tahsin states that it did not designate Byers as a testifying expert witness.   The court will dismiss McCulloch's motion to exclude Byers as moot.

pounds.   (Instruction and Safety Manual, Ex. B, Dkt. No. 61-1.)   This is a standard hang-on treestand (also known as fixed position), which is a particular style of treestand that is affixed to the tree at height through the use of straps.   Hunters gain entrance to these stands through the use of climbing aids such as stick ladders and tree steps, which are sold separately.   The seat platform is secured to the seat support frame by two steel support cable assemblies.   The product is used for hunting which allows the hunter to sit at an elevated position in a tree above and closer to the game they are hunting.

On October 3, 2019, plaintiff had installed the subject treestand on a tree for a future hunt with his son (where he had previously installed another hang-on treestand and stick ladders) and was standing on the foot platform preparing to descend.   He claims that the steel support cables that attach the foot platform to the frame separated causing him to fall to the ground.   (McCulloch Dep. 104–05, 110, 113–14, Ex. G, Dkt. No. 61-3.)   He was not connected to the tree with a safety harness or climbing lineman's belt, contrary to the warnings and instructions.   (*Id.* at 48.)

**B.   Design and Testing**

Tahsin began manufacturing treestands in 2001.   Because the hunter uses the treestand in an elevated position, Tahsin provided an entire hunting system, which included not only the hang-on treestand, but also a full body safety harness that attached around the hunter and connected to the tree in the event of a fall, as well as written warnings and instructions and a safety video.   (*See* Instruction and Safety Manual; Instructions and Warnings for Safety Harness, Ex. C, Dkt. No. 61-2; Safety DVD, Ex. D, Dkt. No. 63-3.)

The subject treestand was designed and manufactured to comply with applicable

2

TSM/ATSM standards.   (Testing Documents, Ex. E, Dkt. No. 62-1.)   It was tested by an independent third-party laboratory and found to be in full compliance with all applicable treestand industry TMS/ASTM standards.   The third-party laboratory confirmed that the treestand, including the cables, was more than strong enough for a loaded capacity of 300 pounds.   (Testing Documents.)   The subject treestand was also tested in-house for quality control and found to be in full compliance with applicable TMS/ASTM standards as well as all design specifications for this product before this model was introduced to market.   (Def.'s Third Supp. Answers to Interr. No. 8, Ex. F, Dkt. No. 62-2.)   The cable assemblies are designed to carry significantly greater capacity over that of the expected load during normal use.   (Affidavit of G. Saunders ¶ 25, Ex. I, Dkt. No. 64-4.)   This was confirmed by the testing by plaintiff's expert, which demonstrated an ultimate strength of 1,606 pounds, which is five times the maximum expected static load at the maximum user weight of 300 pounds, with a safety factor of nine.   (*Id.* ¶¶ 24–25.)

The steel wire cables used on the subject treestand are zinc-plated (electro-galvanized), which were certified by the cable supplier and constituted an appropriate manner in which to guard against corrosion in applications such as treestands.   (Affidavit of M. Vogler ¶¶ 10–11, Ex. H, Dkt. No. 62-4.)   The cable assemblies are covered with a black exterior polymer sleeve over the majority of their length as well as heat shrink tubing to cover the crimped end connector and copper terminal regions of the cable assemblies.



Both the material and design of the subject steel cables have not changed since the cables' initial design in 2005, other than extending the plastic coating to the ends of both sides of the steel cables where the cables connect to the treestand foot platform and support frame.   The manufacturer continues to use the same cable system today, and approximately 1.8 million of these steel cables are currently on the market utilizing the same cable supplier, cable components and materials, manufacturing process and design.

The galvanized zinc coating used on the steel cables acts as an anti-corrosive treatment to protect the underlying steel from exposure to the elements, such as moisture and oxygen.   (Vogler Aff. ¶ 11.)   The ends of the steel cables are lopped and crimped with a copper tube to provide eye-loops to attach it to the platform.   The use of a copper crimp is a widely used method in the steel wire industry.   The material and overall configuration of the subject treestand and cables has been used over the last two decades.   Every major manufacturer of hang-on treestands, similar to the one at issue in this case, uses a similarly configured product.   (Saunders Aff. ¶ 25.)

Prior to 2013, the cables on at least some of Tahsin's hang-on stands were uncovered, allowing the user to visibly see the cable.   (Deposition of Alyssa Debiak 56, 80, Ex. T, Dkt. No. 58-7.)   Starting in 2013, defendant implemented a design change, which consisted of a shrink wrap rubber coating that went around the cable system.   Plaintiff maintains that the rubber coating went

around the entire cable system.   (Debiak Dep. 56; Report of George Saunders 75, Ex. AA, Dkt. No.

58-14.)   Tahsin contends that the coating was not added to the entire cable, just the ends of the

cable as the middle part had always been coated.   (Def.'s Third Supp. Answers to Interr. No. 19.)

     The failed cable assemblies were constructed using a copper ferrule to crimp the tag end of

the wire rope.   (Ex. W, Dkt. No. 59-9; Report of Charles Powell 4, Ex. N, Dkt. No. 58-1.)   Copper

is a material that is more cathodic than either zinc or iron in the galvanic material series and will

result in the accelerated corrosion of both wire rope elements when these materials are placed in

contact with each other in the presence of an electrolyte like environmental water.   (Powell Report

4–5; Deposition of Michelle Vogler 44–45, Ex. Q, Dkt. No. 58-4.)   The accelerated corrosion and

fracture point for both of the subject wire cables occurred adjacent to the copper ferrule where the

wire rope diameter was doubled.   (Powell Dep. 5.)   Defendant performed no testing before making

the 2013 design change with regard to the rubber coating's effect after being exposed to the

environment.   (Powell Report 7; Debiak Dep. 63–64.)

     Defendant discontinued manufacturing treestands in 2013.   Primal Vantage took over

defendant's clients and sold 357,932 hang-on treestands with the same overall steel cable design as

the subject treestand from 2013–19.   (Def.'s Answer to Pl.'s Second Interr. No. 24, Ex. V, Dkt. No.

64-7.)   That equals 715,864 individual cables, but defendant sold only 764 replacement cables from

2013–19.   (Ex. U, Dkt. No. 60-5.)

     Defendant had knowledge of the cables on its treestand breaking in certain instances.   (*See*

Ex. U.)   Defendant knew that treestand users sometimes do not properly wear their safety harness.

(Deposition of LJ Smith 26, 27, Ex. S, Dkt. No. 58-6.)   Defendant also knew that treestand users

sometimes do not read or follow the instruction manual.   (*Id.* at 27.)

## C.   Warnings

The subject treestand was provided with written warnings and instructions, as well as the

warning label affixed directly to the treestand, that provided the user with pertinent information

related to the safe and proper use of the product.   (Instruction and Safety Manual.)   One of the first

warnings indicates "Always Wear a Safety Harness with this Product."   The written warnings

included detailed instructions.[2]   Under the "Proper Care and Maintenance" section, additional

---

[2]   **"Warning Every year serious injury and even death occurs from hunting related falls.**   To ensure your safety, please **COMPLETELY** read and follow this safety manual and **ALL** warning labels **BEFORE** assembling, installing or utilizing this product.

Please read the following instruction manual and warnings labels completely before utilizing this product. Failure to understand and execute the instructions and warnings may result in serious injury or death . . . .

**ALWAYS** read and understand all warnings and instructions.   Watch the enclosed DVD in it's entirety before doing anything with this product including assembly, installation etc. before each use of this product.   Failure to read and understand all warnings and instructions and DVD material may result in serious injury or death.

**ALWAYS** inspect the tree stand and the Fall Arrest System (FAS) (Harness) for signs of wear or damage **BEFORE** each use.   Also inspect to ensure that nuts and bolts are secure.   Pay special attention to the harness and straps, guaranteeing that nothing has been frayed or severed.   Destory all products that cannot be repaired by the manufacturer.   Contact a Customer Service Representative for replacement parts.   The Fall Arrest System **MUST** be discarded and replaced after a fall has occurred.

**ALWAYS** keep instructions (written and video) in a safe place and review before each use.   It is the responsibility of the treestand owner to furnish the complete instructions to anyone who borrows or purchases the treestand from you.

**NEVER** use this treestandfor any use other than hunting.   Our treestands are designed for hunters to wear a Full Body Harness.   If you are not completely comfortable and confident with your ability to safely install, ascent, hunt and descend using a Full Body Harness and this treestand, **DO NOT PROCEED**.

**DO NOT** leave your treestand outside since weather or animals may cause damage.   Tree growth can also cause stress and damage straps and buckles.   It must be stored inside when not in use.

**ALWAYS** wear a Fall Arrest System (FAS) (Harness) consisting of a full body safety harness with lineman's belt after leaving the ground.   A TMA Certified Full Body Harness with lineman's belt must always be connected to yourself and the tree during ascending, hunting and descending.   The use of a lineman's belt is **REQUIRED AT ALL TIMES** during ascending, hunting and descending the tree stand.   When using a lineman's belt to ascend the tree, the full body harness MUST be attached to the tree before stepping onto the tree stand.   The length of the harness tether

warnings and instructions are provided:

> o   Inspect for defects (damage, rot, corrosion, cracks, freezing, excessive heat, etc.) before every use is required.
>
> o   **We recommend replacing the hardware/cables/nuts/bolts/clips on your treestand every two (2) years or sooner if inspection finds it necessary.**   Use only Primal Vantage approved replacement straps and parts. Use of any other straps or parts, will be viewed as a modification of the product . . . . Failure to follow these instructions may result in serious injury or death.
>
> o   **DO NOT** overtighten the hardware.  **DO NOT** use a socket wrench.   This can lead to structural damage and may negatively affect the performance of your stand.   Failure to follow these instructions may result in serious injury or death.

(Instruction and Safety Manual 4 (highlighting emphasis added).)   The two-year cable replacement instruction was added in 2013 for all of Tahsin's hang-on treestands.   The two-year replacement instruction was added to ensure that the cables were safer for use by the consumer regardless of exposure during those two years.   (Debiak Dep. 65–66.)

The written warnings and instructions also provided the following attachment instruction to be completed before the user leaves the ground:

> STEP 1: While wearing your safety harness, connect your climbing belt to the tree following manufacturer's instructions.   Climb to the desired height using your climbing aid.   Once you have reached the desired height, hoist your treestand into position.
>
> STEP 6: When moving from your climbing aid to your Hang-On Tree Stand, step down from the aid to the stand as showing in Fig. 6. Cautiously put your weight on the stand's platform. The additional

---

strap must be minimized at all times.   It should be adjusted so that it is above the head with no slack in the sitting position and you should have the minimum amount of slack possible when climbing.   You **MUST** stay connected at all times after leaving the ground while using climbing aids, hang-ons and climbing tree stands.   Single safety belts and chest harnesses are no longer allowed and should NEVER be used.   If you are not weating a Full Body Harness properly attached to the tree, that is protecting you from a fall, **DO NOT** *leave the ground*.   Failure to wear your Full Body Harness may result in serious injury or death.   Falls can occur at anytime after leaving the ground."   (Instruction and Safety Manual (emphases in original).)

weight will crate tension on the tree attachment strap and cables.



**STEP 6:** When moving from your climbing aid to your Hang-On Tree Stand, step down from the aid to the stand **as shown in Fig. 6.** **Cautiously** put your weight on the stand's platform. The additional weight will create tension on the tree attachment strap and cables.

FIGURE 6

⚠ **WARNING**
DO NOT LIFT THE FOOT PLATFORM WHILE THE STAND IS IN USE. LIFTING THE FOOT PLATFORM COULD CAUSE YOUR STAND TO SHIFT, RESULTING IN SERIOUS INJURY OR DEATH. YOU MUST ALSO WEAR A SAFETY HARNESS AT ALL TIMES WHILE THE STAND IS IN USE, INCLUDING CLIMBING AND DESCENDING. FAILURE TO DO SO COULD RESULT IN SERIOUS INJURY OR DEATH.

CAUTIOUSLY put your weight on the stand's platform
The additional weight will create tension on the tree strap and cables.

In addition, the warning label affixed to the subject treestand provided additional warnings and instructions regarding the importance of remaining secure to the tree at all times, stepping down on the platform from the climbing aid, inspecting the product before each use for wear or damage:

⚠ **W A R N I N G**

Failure to follow all warnings listed below could result in serious injury or death.

ALWAYS read and understand all warnings and instructions before each use of this product. Failure to read and understand all warnings and instructions may result in serious injury or death.

ALWAYS inspect the tree stand for signs of wear or damage BEFORE each use. Also inspect to ensure that nuts and bolts are secure and straps are not frayed, worn, or broken.

NEVER exceed weight limit of 300 lbs. DO NOT use if your combined weight with all your hunting gear and any accessories exceeds 300 lbs. Use of tree stand over the weight limit may result in serious injury or death.

ALWAYS wear a Fall Arrest System (FAS) consisting of a full body harness with lineman's belt after leaving the ground. You MUST stay connected at all times after leaving the ground. If you are not wearing an FAS that meets TMA standards, *DO NOT leave the ground.* Failure to wear an FAS may result in serious injury or death.

DO NOT use this tree stand while under the influence of alcohol, medication, or illegal substances. Use of tree stand while under the influence of any of these substances may result in serious injury or death.

NEVER use this tree stand if you have a history of health problems such as *(but not limited to)* heart problems, back problems, impaired vision, equilibrium impairments are afraid of heights or have been advised by a doctor not to do any strenuous activity. If you are feeling ill, nauseous, or dizzy DO NOT use this tree stand or If you are not physically fit, well rested and alert. Physical ailments can reduce your ability to safely install, utilize and remove your tree stand.

NEVER use this tree stand during inclement weather such as (but not limited to) thunderstorms, snowstorms, hurricanes, icy conditions, or high winds that could create slippery or dangerous situations.

NEVER use this tree stand on a dead, leaning, loose barked tree or on a utility pole as the tree may fall, break, or uproot and may result in serious injury or death.

NEVER leave the ground without checking every ladder section connection to ensure they are firmly connected. If ladder sections are separating, with the help of at least two other people, remove the tree stand from the tree, tighten all connections and reinstall on the tree.

NEVER step up to the platform. Climbing aids such as slick ladders, MUST extend above the platform of the hang-on to allow the user to step down on the platform. The Full Body Harness MUST always be attached to the tree even when stepping down into the tree stand.

DO NOT modify or alter your tree stand.

NEVER remove or deface warning labels. Replacement instructions can be obtained from the address below.

Plaintiff was provided instructions and warnings with his after-market safety harness that he used when hunting.  Specifically, the Tree Spider Harness instructions reinforced the importance of using a safety harness and on how to properly remain connected to the tree when installing and using a hang-on treestand, noting that "if you will be using a non-Climbing (fixed or hang-on) treestand: The use of a lineman's style climbing belt is required when ascending, descending and

installing a hang-on treestand."   (Safety Harness Instruction 4, Ex. J, Dkt. No. 51-10.)   It provided

instruction on how to use the lineman's belt with illustrations.   (*Id.*)

**D.   Plaintiff's Use of the Subject Treestand**

Plaintiff is a life-long hunter and explained that he has owned approximately 60–70

commercial treestands over the years.   (McCulloch Dep. 35, Ex. G, Dkt. No. 61-3.)   He admitted

that in the last ten years, treestands he purchased always came with full body safety harnesses and

safety DVDs.   He recalled that he had watched the safety DVD for treestand use and recalled there

being specific instructions related to how to properly use a safety harness and how to use a safety

harness with a hang-on treestand.   Plaintiff did not specifically recall receiving the warnings and

instructions for the subject treestand, which was purchased by his uncle.   However, he testified that

had he received the written warnings and instructions, he would not have read them in their entirety

and "may have breezed through them" instead.   (*Id.* at 32, 71–72.)   Plaintiff recalled the warning

label being affixed to the treestand—specifically noting that it stuck out to him, but he never

reviewed the contents of the warning label.   (*Id*. at 73.)   Contrary to the warnings and instructions,

plaintiff admitted that he may have removed the warning label because of the reflection on it or the

weather took it off.   (*Id*. at 73–74.)

Even though plaintiff admitted to not having read or reviewed the warnings and instructions

for the subject treestand, he agreed that it is a good idea to follow the manufacturer's warnings and

instructions on how to safely use the product and it is important to follow assembly and installation

instructions provided.   He admitted that it is important to follow the manufacturer's instructions on

how to properly care for and maintain a product and how to utilize the safety equipment with a

9

product like a treestand.   He further acknowledged the importance of following any replacement part schedule provided by a manufacturer.   He would try and follow the manufacturer's warnings and instructions because not doing so would increase the likelihood of an accident.   (McCulloch Dep. 52–53.)

Plaintiff further admitted that had he been aware of the instruction to replace the steel cables every two years, he would have complied and replaced them.   He further acknowledged that based on the treestand being manufactured in 2013, he should have replaced the cables about four times before his accident occurred.

Plaintiff's uncle, William Ayers, purchased the subject treestand at Walmart, but he could not recall its year of purchase.   (Ayers Dep. 23–24, Ex. K, Dkt. No. 51-11.)   Plaintiff acknowledged he cannot dispute that the subject treestand was manufactured in 2013 and would have been purchased that same year.   (McCulloch Dep. 132.)   At the time of purchase, Ayers bought two identical treestands, keeping one for himself and giving the other to plaintiff.   Ayers did not recall giving plaintiff the written warnings and instruction that were in the box with the subject treestand.   Ayers had already taken the treestand out of the box when he gave it to plaintiff.   Plaintiff admitted there were no missing parts for the stand.

Plaintiff testified that the subject treestand had already been installed in a tree the first time he saw it.   He never saw any of the instructions that came with the treestand.   He never asked Ayers to see the instructions because he had seen a lot of treestands over the years and did not need to review specific instructions.

In its first hunting season, the subject treestand remained installed on the tree from

10

September to January or February.   He removed the treestand after the first season, and then he took it to different farms.   Plaintiff used the subject treestand about ten times a season each year until the day of the accident, for a total of around 70 uses.

Plaintiff knew the importance of properly maintaining and inspecting his treestand and its components, including the cables and steel exposed to outdoor elements.   He knew not to leave his hunting equipment out exposed to the elements for long periods of time.   He understood that the steel and strap material of treestands will start to deteriorate and corrode over time if left exposed to environmental elements.   Even knowing this, plaintiff admitted that his standard procedure was to install his hang-on treestand at the beginning of the hunting season and leave it on the tree until the season ended around January or February.   Plaintiff called the subject stand his "travelling stand" that he would move around to different spots.

Plaintiff knew that it was important to inspect the treestand before each use.   He knew to inspect the steel components for rust and would look at any exposed metal on the cables for "excessive corrosion."   Based on his experience with many treestands, he knew that there are times when you need to make the decision to remove a treestand from service or replace parts because it is no longer safe to use based on decay and corrosion.   He further noted that if there were any signs of damage to the steel frame or support cables, he would not use it.   Ayers and plaintiff would always complete treestand inspections together, but plaintiff acknowledged that he never replaced any cables on his treestands.   Instead, he would just get rid of them if there was any kind of wear.

The only maintenance plaintiff performed on the subject treestand was replacing bushings on the bottom vertical support bar because they were squeaking.   He replaced these bushings the

morning before the accident occurred.   He also wrapped his seat cushion in waterproof tape because it had been "chewed up" (deteriorated).   There were no other replacements or maintenance to the stand since 2013.   Other than the squeaking bushings, there were no operational problems with the subject treestand.   Prior to his accident, plaintiff was aware that the cables for the other treestand he purchased at the same time as the subject treestand had broken.[3]

Plaintiff would have replaced the cables if he knew it was required.   If he had seen a warning on the stand in any place, telling the user to replace the cables every two years, he would have done so.   (McCulloch Dep. 140, 155–56.)

**E.   Plaintiff's Accident**

On the day of his accident, plaintiff was not hunting, he was hanging the subject treestand before hunting season.   Even though he appreciated the risk of falling when installing a hang-on treestand, he was not wearing his safety harness.   Plaintiff already had another hang-on treestand and the climbing sticks installed in the tree adjacent to where the subject treestand was being installed.   He installed the climbing sticks and Millennium hang-on treestand sometime in the very beginning of September or the last week of August.   Plaintiff was installing the subject treestand on the same tree, so he could hunt from the subject treestand while his son hunted from the Millennium stand.

The morning of the accident, plaintiff inspected the stand and that is when he noticed that the bushings were squeaking so he decided to replace them with the help of his friend John Carroll.

---

[3]   It is unclear whether plaintiff knew that the other stand was the same model as the one he was using. (Ayers Dep. 35 ("[H]e was aware that the cable broke on a stand that I had, but I do not know that he was aware that it was the Ameristep stand and I don't think I ever told him.   I just told him I had a cable break on a tree stand.").)

He also taped up the seat that morning.   Plaintiff climbed up using his climbing sticks, and then Carroll hooked up the subject treestand to a haul line while plaintiff was sitting in the Millennium stand.   Plaintiff was sitting in the Millennium stand while he installed the subject treestand.   In this process, plaintiff would always install a screw and stud from which to hang the stand and then install the black affixed strap that was attached by the manufacturer around the tree and cinch it tight.   He would then add an extra strap at the top and an extra strap at the bottom.   The way it was installed, the subject stand would have been installed about one to two feet below the seat platform of the Millennium stand, requiring him to step down about 12 inches to the Millennium stand.

Plaintiff stepped down onto the platform of the subject stand and felt it settle a bit into the tree.   He screwed in the bow hanger that was in his pocket.   He reached down and grabbed the seat of the subject stand and was getting ready to climb back over to the Millennium stand when the cables broke.   Both of his feet were on the foot platform with both of his hands on the seat.   He recalled stepping back with one foot and being in the process of stepping back with his other foot and that is when he heard a "pow" or "popping" sound and the cables broke.   (McCulloch Dep. 110, 113–14.)

The subject treestand was removed from the tree by Ayers around the last week of October, the same month as the accident.   Ayers climbed up the tree and was unable to loosen the ratchet straps as they were too tight, so he cut the straps securing the stand to the tree allowing the stand to fall to the ground.[4]

---

[4]   The parties dispute whether the treestand was then stored in Ayers' temperature-controlled shop or whether it was stored outside Ayers' shop against the wall, exposed to the elements.   (*See* McCulloch Dep. 90, 94; Ayers Dep. 44–45.)

When plaintiff fell, the top portion of both cables on the treestand failed and separated under the rubber coating due to corrosion damage.   (Powell Report 4; Deposition of George Saunders 30, Ex. O, Dkt. No. 60-2.)   Defendant admits that the cables separated due to excessive corrosion, but he disputes whether the coating was covering the cables where they separated on the day of the accident.   (Debiak Dep. 62, 64 (noting the possibility that the coating had been compromised due to long-term environmental exposure).)   Moisture was trapped underneath the plastic coating added to the cable assemblies in 2013, and while in direct contact with the zinc galvanized steel and copper ferrule, severely accelerated the corrosion process.   (Saunders Dep. 85–87; Powell Report 4–5.)

## II.   ANALYSIS

### A.   Summary Judgment Standards

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   A material fact is one that "might affect the outcome of the suit under the governing law."   *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.   *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.   *Celotex*, 477 U.S. at 323.   Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other

means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), 56(e).   All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."   *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## B.   Products Liability Claims

In Virginia, a plaintiff can bring a products liability claim under a negligence theory or an implied warranty theory.   *Jeld-Wen v. Gamble*, 501 S.E.2d 393, 396 (Va. 1998).   Under either theory, plaintiff must establish three elements:   (1) the product contained a defect which rendered it unreasonably dangerous for ordinary or foreseeable use; (2) the defect existed when it left the defendant's hands; and (3) the defect actually caused the plaintiff's injury.   *Benedict v. Hankook Co. Ltd.*, 295 F. Supp. 3d 632, 637 (E.D. Va. 2018).   Under an implied warranty theory, plaintiff has the burden of proving (1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the defendant's hands.   *Logan v. Montgomery Ward & Co.*, 219 S.E.2d 685, 687 (Va. 1975).   Plaintiff has sued under the implied warranty of merchantability theory.

Virginia has adopted the reasonably safe/unreasonably dangerous standard as a broad-based definition of product defect.   A product is "unreasonably dangerous" if it is "defective in assembly or manufacture, unreasonably dangerous in design, or unaccompanied by adequate warnings concerning its hazardous properties."   *Morgen Indus., Inc. v. Vauan*, 471 S.E.2d 489, 492 (Va.

1996).   The issue of whether a product is unreasonably dangerous is a question of fact.   *Id.* (citing *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 115 (4th Cir. 1981)).

"Virginia products liability law encompasses a risk-utility analysis in negligent design cases."   *Blevins v. New Holland North Am., Inc.*, 128 F. Supp. 2d 952, 959–60 (W.D. Va. 2001). The Fourth Circuit has instructed that the concept of unreasonable dangerousness is essentially the same whether liability is asserted on grounds of negligence or warranty.   *See Dreisonstok v. Volkswagenwerk, A.G.*, 489 F.2d 1066, 1068 (4th Cir. 1974) (applying Virginia law).   "Liability for negligent design thus is imposed only when an unreasonable danger is created and whether or not this has occurred should be determined by general negligence principles, which involved a balancing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to avoid the harm."   *Id.* at 1071.   While Virginia law requires manufacturers to make reasonably safe products, it does not require them to adopt the safest conceivable design.   *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1177 (4th Cir. 1997); *Slone v. Gen. Motors Corp.*, 457 S.E.2d 51, 54 (Va. 1995) ("[A] manufacturer is not required to supply an accident-proof product.").

The available liability defenses to a breach of warranty theory are unforeseeable misuse and open and obvious defect.   *Wood v. Bass Pro Shops, Inc.*, 462 S.E.2d 101, 103 (Va. 1995). "[T]he rules of implied warranty apply only when the article is being operated or used in the manner intended for it.   A manufacturer cannot be held to foresee an unanticipated or unpredictable misuse of the article it manufactures or sells."   *Layne-Atlantic Co. v. Koppers Co.*, 201 S.E.2d 609, 614 (Va. 1974).

16

### 1. Unreasonably dangerous

Tahsin argues that McCulloch has no evidence of a design defect.   Tahsin maintains that the design of the subject treestand has adequate strength and durability; it met and exceeded all industry standards applicable to treestands; and it was tested and found to be in compliance with industry standards by a third-party testing laboratory.

McCulloch's expert witness, Charles Powell, provides evidence of an unreasonably dangerous design defect.   Powell explains that the ferrule used to crimp the end of the cable, after it wraps around the bolt, was made of copper.   (Powell Report 4–5.)[5]   Powell states that the cable system experienced accelerated corrision in the same spot on both cables because copper is cathodic to the galvanized steel material of the cables.   When dissimilar metals contact an electrolyte, such as rainwater, corrosion can occur very fast.   Powell writes:

> Copper is a material that is more cathodic than either zinc or iron in the galvanic material series and will result in the accelerated corrosion of both wire rope elements when these materials are placed in contact with each other in the presence of an electrolyte like environmental water. Copper wire rope ferrules should only be used with stainless steel wire ropes so as to prevent the possibility of accelerated galvanic corrosion attack to the wire rope.   The accelerated corrosion and fracture point for both of the subject wire cables occurred adjacent to the copper ferrule where the wire rope diameter was double.   The cable assembly could only fail at this position, instead of a single diameter location, if severely weakened by corrosion.

(*Id.*)   The external polymer coating on the wire rope and heat shrink tubing on the end fittings did not allow the user to evaluate the condition of the cable to see whether there was severe corrosion. (*Id.* at 6.)   Defendant's expert, George Saunders, stated in his deposition that what likely caused the

---

[5]   For the reasons stated below, Powell's report is admissible expert testimony.

accelerated corrosion was water trapped between the two ferrules under the black coating. (Saunders Dep. 85–87.)

Thus, there is an issue of fact about whether the subject treestand had an unreasonably dangerous design defect.

### 2. Misuse of the product

Defendant argues that plaintiff misused the product in several ways: (1) leaving the treestand unattended in a tree for extended periods of time; (2) failing to properly maintain the product by not replacing the cable assemblies as directed and using components that were degraded and compromised; (3) failing to inspect the treestand for signs of degradation and corrosion; and (4) not using a full body harness to remain connected to the tree when he was in the treestand at an elevated position.

Again, however, there are issues of fact as to whether any of these alleged misuses were unforeseeable, unanticipated, or unpredictable.   *See Wood*, 462 S.E.2d at 103; *Layne-Atlantic Co.*, 201 S.E.2d at 614.   For example, there is evidence in the record that it is not uncommon in the hunting world for hunters to not wear a harness while using a treestand.   (Deposition of Lorne Smith 26–27, Ex. S, Dkt. No. 58-6.)   Smith, who is defendant's hunting expert, testified that none of the 70 to 75 treestand accident cases for which he has provided expert testimony involved a plaintiff that was properly wearing a safety harness.   (*Id.* at 26.)

> Q.     So it is fair to say then that sometimes tree stand users don't properly wear their safety harness?
>
> A.     Yes, there are times that they do not properly wear their safety harness, yes.

> Q.     You think it's fair to say that sometimes users of tree stands fail to wear their harness at all?

> A.     There are times that they choose not to wear their harness, yes.   That's their choice.

(*Id.* at 27.)   For his own part, plaintiff, an experienced, life-long hunter, testified that he generally wears his safety harness when hunting from an elevated position.   (McCulloch Dep. 42.)   The cable failure occurred while plaintiff was installing the treestand to the tree, and he was not wearing the harness because of how difficult it is to wear a harness while attaching the tree stand to a tree. That hunters, such as plaintiff, regularly use treestands without a harness would allow a jury to find that this was a predictable misuse.

Regarding the cable assemblies, Tahsin cites the Instruction Manual's directive to replace the cables every two years.   Plaintiff has provided evidence that replacement assemblies are rarely ordered.   From 2013 to 2019, roughly 357,932 of the same model of the subject treestand were sold, which equals 715,864 cables (two for every treestand).   (Def.'s Answer to Pl.'s Second Set of Interr. No. 24, Ex. V, Dkt. No. 58-9.)   During the same time period, defendant sold only 764 "replacement cables" to its customers.   (Spreadsheet of Cable Sales, Ex. U, Dkt. No. 60-5.) Therefore, a jury could find that not replacing the cable assemblies was also predictable.

### 3.   Proximate cause

The proximate cause of an event is "that act or omission which, in natural and continuing sequence, unbroken by an efficient intervening cause, produces the event, and without which the event would not have occurred."   *Kellerman v. McDonough*, 684 S.E.2d 786, 793 (Va. 2009).   "It is not essential . . for the plaintiff to show that an act, claimed to have been the proximate cause of a

certain result, was the only cause.   It is sufficient if it be established that the defendant's act produced or set in motion other agencies, which in turn produced or contributed to the final result." *Von Roy v. Whitescarver*, 89 S.E.2d 346, 352 (Va. 1955).   "There may be more than one proximate cause of an event." *Atkinson v. Scheer*, 508 S.E.2d 68, 71 (Va. 1998).   A tortfeasor is responsible "for all the consequences that may ensue in the ordinary course of events, even though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer." *Jefferson Hospital v. Van Lear*, 41 S.E.2d 441, 444 (Va. 1947).   In order for an intervening cause to relieve a tortfeasor of liability, it must be the sole cause of the injury without the defendant's negligence contributing in the slightest degree. *Atkinson*, 508 S.E.2d at 72.

Tahsin frames its argument about plaintiff's alleged misuses of the treestand—improper maintenance and storage, improper use, failure to inspect, and failure to replace the cable assemblies— in terms of proximate cause.   In other words, defendant argues that these alleged misuses were the proximate cause of plaintiff's injuries, not the design defect.   But a jury could find that the cables failing and breaking, due to a design defect, "produced the event" that is the subject of this lawsuit. *Kellerman*, 684 S.E.2d at 793.   A jury might find that plaintiff's misuses are intervening causes but not the sole causes of plaintiff's accident. *Atkinson*, 508 S.E.2d at 72 (intervening cause must be the sole cause to relieve tortfeasor of liability).   There are disputes of fact, and these disputes about proximate cause preclude the entry of summary judgment in favor of Tahsin.

### 4. Mitigation

Tahsin argues that plaintiff failed to mitigate his damages because he did not properly use the full body safety harness.   Mitigation is a limiting principle on damages due to injury.   It cannot be used to escape liability in the first instance.   "Unlike most affirmative defenses, mitigation of damages is not a defense that, if proven, constitutes an absolute bar to the plaintiff's claim. Instead, a defense of mitigation recognizes that a plaintiff's conduct *following the defendant's negligence* 'may be a reason for reducing damages,' but it does not necessarily bar all recovery." *Monahan v. Obici Med. Mgmt. Srvs., Inc.*, 628 S.E.2d 330, 337 (Va. 2006) (emphasis added).

Mitigation is an issue of fact for the jury.

### 5. Assumption of Risk

Tahsin argues that plaintiff assumed the risk of injury when he knowingly put his weight on the platform of the treestand without remaining connected to the tree with a safety harness. However, assumption of risk is not available as a defense to a claim for breach of the implied warranty of merchantability.   *See Wood*, 462 S.E.2d at 103.

### 6. Failure to warn

Plaintiff argues that Tahsin failed to properly warn users of the design defect.   "A manufacturer is not an insurer of its product's safety, and a manufacturer has a duty to warn only if it knows or has reason to know that its product is dangerous."   *Owens-Corning Fiberlas Corp. v. Watson*, 413 S.E.2d 630, 634 (Va. 1992).   In a failure to warn case, the plaintiff must prove that the manufacturer (1) knows or has reason to know that the product is or is likely to be dangerous for the use for which it is supplied, (2) has no reason to believe that those for whose use the product is

supplied will realize its dangerous condition, and (3) fails to exercise reasonable care to inform

them of its dangerous condition or of the facts which make it likely to be dangerous.   *Funkhouser*

*v. Ford Motor Co.*, 736 S.E.2d 309, 313 (Va. 2013).

Plaintiff admits that he did not read the warnings that came with the treestand.   Specifically,

plaintiff did not recall receiving written warnings and instructions, and, even if he did, he would not

have read them.   Also, plaintiff recalled the warning label affixed to the treestand, but he never

reviewed the contents of the label; in fact, he may have removed the label due to its reflection.   A

plaintiff in a failure to warn case is required to prove that the failure to warn was the proximate

cause of his injury.   *See Singleton*, 685 F.2d at 116–17 (explaining that the "lack of adequate

warning . . . must be shown by a preponderance of the evidence to be a proximate cause of the

accident"); *Berger v. Ford Motor Co.*, 95 F. App'x 520, 522 (4th Cir. 2004) (affirming dismissal

where "plaintiffs could not establish the causation element of their failure-to-warn claim, namely,

that the absence or inadequacy of a warning was a proximate cause of the injury") (citing *Singleton*,

685 F.2d at 116–17); *Ford Motor Co. v. Boomer*, 736 S.E.2d 724, 733–34 (Va. 2013) (discussing

requirement that failure to warn be the proximate cause of plaintiff's injury); *Featherall v. Fireston*

*Tire & Rubber Co.*, 252 S.E.2d 358, 369 (Va. 1979) (finding that plaintiff established a prima facie

case of negligent failure to warn where the failure to warn "constituted negligence which

proximately caused the explosion and plaintiff's injuries").   Plaintiff cannot make this showing

given his admission that he did not read and would not read any warnings.   Thus, Tahsin is entitled

to summary judgment to the extent plaintiff asserts liability based upon plaintiff's failure to warn.6

---

6  Because of this ruling, and expert testimony regarding any failure to warn will also be excluded.

*** 

For all of these reasons, defendant's motion for summary judgment will be granted in part regarding plaintiff's failure to warn but denied in part in all other respects.

## C.  Expert Testimony

Federal Rule of Evidence 702 and the standards established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern admissibility of expert testimony.   Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Before considering whether a proffered expert's testimony is reliable, the court first determines whether the witness qualifies as an expert.   A witness may qualify as an expert on the basis of "knowledge, skill, experience, training, or education."   Fed. R. Evid. 702.   The expertise must relate to the areas in which the expert is expressing opinions.   *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989).   Exclusion should occur only where all bases for expertise are lacking with regard to the issue for which the opinion is offered, and a proffered expert "need not be precisely informed about all details of the issues raised in order to offer an opinion." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) (quoting *Thomas J. Kline, Inc.*, 878 F.2d at 799).

While the test for exclusion may be a "strict one," *Kopf*, 993 F.2d at 377, some type of relevant expertise is nonetheless required.   For example, where experience is one of the bases for a witness's expertise, the witness must "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts."   *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 674 (E.D. Va. 2013) (alteration in original) (citations omitted).   Additionally, a witness's expertise must be tailored, to some degree, to the specific opinions offered and the particular facts in the case; general expertise or knowledge on a broad topic or general field may be insufficient, depending on the facts of a case.   *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391–92 (D. Md. 2001) ("The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.") (citing *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 247 (4th Cir. 1999)).

After ensuring that an individual qualifies as an expert, this court has an obligation under *Daubert* to act as a gatekeeper and ensure that any testimony concerning scientific, technical, or other specialized knowledge offered in support of a party's claim is "not only relevant, but reliable." 509 U.S. at 589; *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting same).   The proponent of the testimony must establish its admissibility, although it need not prove its expert's theory is correct.   *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001); *Md. Cas. Co. v. Therm–O–Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998).   First, the trial court must ask whether proffered scientific evidence is valid and reliable.   *United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000).   Second, the court asks whether the evidence will help the trier of fact, which

is generally a question of relevance, or "fit."   The court must ask if, assuming the evidence is reliable, it will "assist the trier of fact to understand or determine a fact in issue."   *Md. Cas. Co.*, 137 F.3d at 783 (quoting *Daubert*, 509 U.S. at 592).

The court's role in limiting expert testimony is important: "due to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading."   *Cooper*, 259 F.3d at 199 (citations omitted).   Indeed, "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded."   *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).   Trial judges have "considerable leeway" in excluding evidence, and are required to ensure that "expert testimony must be based on sufficient facts or data, and the expert must arrive at his opinions by properly applying reliable principles and methods to the facts."   *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480 (4th Cir. 2018).   The court is not required to determine that "the proffered expert testimony is irrefutable or certainly correct" because as "with all other admissible evidence, expert testimony is subject to testing by vigorous cross-examination, sentation of contrary evidence, and careful instruction on the burden of proof."   *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006).

### 1.   Plaintiff's expert Charles Powell

Powell opines that the galvanized carbon steel wire rope support assemblies on the subject treestand are defective in material design.   Both cable assemblies fractured and separated as a result of corrosion damage and microscopic wire fractures created during the normal expected outdoor use of the subject treestand.   The cable fractures released the support on the treestand foot platform and

directly caused McCulloch's fall and severe injury.   The subject treestand was unreasonably dangerous for its ordinary use and for other reasonably foreseeable purposes.   This unreasonably dangerous material defect existed when it left defendant's hands.   (Powell Report 4.)

Powell notes that the subject failed assemblies were constructed using a copper ferrule as a terminal to crimp the tage end of the wire rope.   Copper is a material that is more cathodic than either zinc or iron in the galvanic material series and will result on the accelerated corrosion of both wire rope elements when these materials are placed in contact with each other in the presence of an electrolyte like environmental water.   The accelerated corrosion and fracture point for both of the subject wire cables occurred adjacent to the copper ferrule where the wire rope diameter was doubled.

As manufactured, with external polymer coating on the wire rope and heat shrink tubing on the end fittings, there is no possibility that a consumer can evaluate a new or used treestand support cable to determine its ability to hold up a person safely in a treestand.   There are no warnings on how to inspect cables, what determines a damaged cable, or any mandate that the cables must be replaced after two years or the treestand cannot be used.

Defendant argues that Powell does not have the necessary background in the design of a treestand steel cable assembly.   He is a mechanical engineer, but has no expertise in the use of treestands or the treestand industry.   Powell did not provide any analysis or opinions regarding a safer alternative design and admitted that the subject design using zinc coating is common and proper for the application.   And Powell ignores the evidence of extensive misuse and exposure to the outdoor elements.

26

Powell is a registered professional engineer with 50 years of experience in engineering failure analysis of products and structures and in accident investigation.   Powell has an engineering degree in metallurgical engineering, and he is trained as a physical metallurgical engineer. Therefore, Powell is qualified to provide design and failure analysis specific to the steel cable assembly.   While Powell is not an expert in the use of tree stands or the tree stand industry, Powell does not attempt to extend his opinion to hunting safety issues not within his purview.

The court rejects defendant's argument that Powell's opinions are speculation and conjecture.   Powell followed reliable engineering principles to conclude that the subject treestand was defective in design.   Defendant emphasizes plaintiff's alleged misuse of the product, but as discussed above, there are issues of fact that the defects in manufacturing, not plaintiff's use, was the cause of plaintiff's injury.   Powell's testimony meets the *Daubert* guideposts of reliability and helpfulness to the trier of fact.

## 2.  Defendant's expert George Saunders

Defendant retained George Saunders to offer opinions as a mechanical engineer/tree stand accident reconstruction/tree stand warnings expert.   (Def.'s Expert Disclosures, Dkt. No. 55-1.) Plaintiff argues that Saunders is not qualified to give metallurgical testimony and his metallurgical opinions lack sufficient foundation and reliability.   Saunders stated in his deposition that copper is not an accelerator of corrosion, contrary to the testimony of plaintiff's expert Powell and contrary to the testimony of defendant's retained metallurgist, Michelle Vogler.   (Vogler Dep. 44–46.) Saunders cites a Department of Defense "Detailed Specification Sheet."   When asked about the DOD spec sheet, Saunders states that the U.S. military uses copper fittings on galvanized steel wire

rope for military aircrafts.   Saunders could not provide any support or context for his reliance on the DOD specifications sheet.

The court finds that Saunders' opinions are based on his education, background, and experience as a mechanical engineer.   While Saunders is not a metallurgist, part of his education in mechanical engineering involved insight into metallurgy, and there is overlap between the two disciplines.   (Saunders Aff. ¶ 5, Ex. BB, Dkt. No. 64-8.)   To the extent that Saunders' opinion is inconsistent with metallurgical principles, that would be appropriate fodder for cross-examination. Plaintiff's motion to exclude Saunders' testimony will be denied.

### 3.  Defendants' expert Lorne Smith, Jr.

Defendant disclosed Lorne Smith as an expert in safety/tree stand accident reconstruction/safety harness.   Smith has experience as a tree stand hunter and safety instructor. He has investigated and reconstructed approximately five hundred treestand hunting accidents over the last forty years.   (Smith Aff. ¶ 11, Ex. DD, Dkt. No. 61-10.)

Smith reports multiple mistakes made by plaintiff that show a habit of him not following warnings and instructions.   Plaintiff argues that this testimony lacks foundation and is prejudicial because Smith does not know about plaintiff's habits and has never witnessed him using a tree stand.   Smith's opinion is based on plaintiff's testimony as well has his investigation of the accident scene.   Smith's testimony about plaintiff's alleged misuses of the treestand, including not wearing his full body safety harness, not using his climbing belt, not placing the stand in a correct location, and improper set up of stick ladders, are relevant to foreseeable misuse.   Smith's opinions are based on hunter safety, hunting product industry practices and knowledge, hunting safety issues,

treestand investigation, and treestand accident reconstruction.   Smith's specialized knowledge will assist the trier of fact, and his opinions on misuse are reliable and relevant.   Therefore, Smith's testimony will not be excluded.

### 4.  Defendant's expert Kimberly Kushner

Kimberly Kushner was designated as a certified nurse life care planner disability care management expert.   Kushner is a Certified Registered Nurse Practitioner, a Registered Nurse, and a Certified Nurse Life Care Planner who has worked in various clinical settings including inpatient and outpatient medical clinics, critical unit/trauma units, and medical/surgical units.   (Kushner Aff. ¶ 5, Ex. FF, Dkt. No. 61-12.)   Kushner has prepared several hundred life care plans and analyzed several hundred life care plans for individuals of various ages and for various injuries, including spinal court injuries, for over eleven years in the field of life care planning.

Plaintiff argues that Kushner's opinions are unreliable because she did not consult with a medical doctor prior to preparing her life care report.   Plaintiff also notes that Kushner never worked in a facility that specialized in spinal cord injury care.   These topics are relevant inquiries for cross-examination.   No one disputes that Kushner is qualified to opine on plaintiff's life care plan.

Plaintiff asserts that Kushner is "way out of her lane" when she "substitutes her opinions about the necessity of future medical care" for those of Dr. Suzanne Groah, who consulted for plaintiff's life care plan.   (Dkt. No. 55 at 25.)   Kushner is a life care planner who is qualified to opine on plaintiff's life care plan.   According to Kushner, the objective of a life care plan is to include services that are necessary to prevent complications, decrease in function, and further

injury.   (Kushner Aff. ¶ 15.)   Kushner's opinion is that many of the surgical interventions suggested by Dr. Groah are speculative and, at this point, cannot be considered necessary treatments.   (*Id.* ¶ 17.)   At this time, it appears that this opinion is admissible, subject of course to cross-examination, so it will not be excluded.   Depending upon the evidence, plaintiff may renew his motion at trial regarding this opinion.

Finally, plaintiff argues that Kushner did not produce her research materials.   Defendant responds that this was due to an oversight by defense counsel and the materials have now been provided.   As the court discussed at the hearing, the parties may agree to depose Kushner again before trial if necessary.

For these reasons, the court will deny McCulloch's motion to exclude Kushner's testimony.

### III. CONCLUSION

For the reasons stated in the foregoing opinion, the court will grant defendant's motion for summary judgment to the extent plaintiff relies upon a failure to warn, but will deny the motion in all other respects.   The court will also deny the motions to exclude expert testimony.   The court will issue an appropriate order.

Entered: September 27, 2022.


/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge

30